UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DENYSE LEWIS,

                              Plaintiff,

              -vs-                                        09-CV-1027-JTC

ERIE COUNTY MEDICAL CENTER CORP.,

                              Defendant.

_____

APPEARANCES:              LAW OFFICES OF STEVEN H. GROCOTT (STEVEN
                          H. GROCOTT, ESQ., of Counsel), West Seneca, New
                          York, Attorneys for Plaintiff.

                          SCHRODER, JOSEPH & ASSOCIATES, LLP (GINGER
                          D. SCHRODER, ESQ., of Counsel), Buffalo, New York,
                          Attorneys for Defendant.

## INTRODUCTION

        Plaintiff commenced this action on November 30, 2009 pursuant to the Americans

with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq.,* Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and the New York State Human Rights

Law ("NYSHRL"), N.Y.Exec. Law § 296 *et seq.*  She alleges that the defendant intentionally

discriminated, harassed, and retaliated against her on the basis of her disability and race.

Additionally, plaintiff alleges that defendant refused to provide reasonable accommodations

and made impermissible medical inquiries in violation of the ADA and NYSHRL.  This

matter is before the court on the defendant's motion for summary judgment (Item 34).

As stated above, plaintiff commenced this action with the filing of a complaint on November 30, 2009 (Item 1). Plaintiff is an HIV-positive, African-American woman employed as a social worker at defendant Erie County Medical Center ("ECMC"). She alleged that she began to experience discrimination in 2002 at the hands of her supervisor, Kathleen Walsh. Specifically, plaintiff complained that Ms. Walsh "belittled, screamed at, chastised, and otherwise treated her differently than non-disabled and Caucasian employees." (Item 1, ¶ 35). Additionally, plaintiff complained that the defendant denied reasonable requests for schedule changes to accommodate her medical appointments and to allow her to participate in an internship as part of her post-graduate studies. *Id.,* ¶¶ 36-37. Plaintiff alleged that she was forced to attend meetings during her lunch break while similarly-situated non-disabled and Caucasian employees were not required to do so. *Id.,* ¶ 39. She also alleged that Ms. Walsh improperly reviewed plaintiff's medical file and closed her medical case at ECMC. *Id.,* ¶ 44. Plaintiff asserted 16 separate causes of action - disability discrimination under the ADA and the NYSHRL, failure to provide reasonable accommodations under the ADA and the NYSHRL, impermissible medical inquiry under the ADA and the NYSHRL, race discrimination under Title VII and the NYSHRL, retaliation under Title VII, the ADA, and the NYSHRL, and hostile work environment under the ADA, the NYSHRL, and Title VII.

Defendant filed its answer to the complaint on January 29, 2010 (Item 7). Following the completion of discovery, the defendant filed this motion on June 26, 2012 (Item 34). It argues that plaintiff cannot establish a *prima facie* case of discrimination under either

Title VII, the ADA, or the NYSHRL because she has admitted that the supervisor, Ms. Walsh, treated employees of all races poorly. Additionally, defendant argues that plaintiff has not shown that she suffered an adverse employment action or that she was retaliated against in response to protected activity. Finally, defendant argues that plaintiff has failed to show that defendant undertook any impermissible medical inquiry or failed to provide reasonable accommodations.

Plaintiff filed a memorandum in opposition to the motion on August 22, 2012 (item 35), and defendant filed a reply memorandum on September 11, 2012 (Item 36). The court has determined that oral argument is unnecessary. For the reasons that follow, the defendants' motion for summary judgment is granted.

## FACTS[1]

Plaintiff commenced her employment at ECMC in October 1997 and is currently employed as a drug counselor in the Immunodeficiency Clinic (Item 34, Appendix, Exh. C, "Lewis Dep.," pp. 42, 65). She was open about her HIV status with her co-workers as she received care herself at ECMC. *Id.,* pp. 55-56. Ms. Walsh became plaintiff's supervisor approximately three to six months after she was hired. *Id.,* p. 60.

---

[1] This factual statement is taken from plaintiff's affidavit in opposition to the motion (Item 35, Appendix); the deposition testimony of plaintiff (Item 34, Appendix, Exh. C; Item 35, Appendix, Exh. B), Kathleen Walsh (Item 34, Appendix, Exh. V; Item 35, Appendix, Exh. C), and Matthew Higgins (Item 34, Appendix, Exh. R; Item 35, Appendix, Exh. K); plaintiff's performance evaluations (Item 34, Appendix, Exhs. D-H), her internal complaints of harassment and discrimination (Item 34, Appendix, Exhs. N, P, Y; Item 35, Appendix, Exhs. E, F), administrative charges (Item 34, Appendix, Exhs. K, S; Item 35, Appendix, Exhs. I, L), and letters and e-mails from plaintiff (Item 34, Appendix, Exhs. Q, U, W, Y, BB, DD; Item 35, Appendix, Exhs. D, G, H); the ECMC Harassment Policy (Item 34, Appendix, Exh. I), reports of internal investigations relating to plaintiff's complaints of harassment and discrimination (Item 34, Appendix, Exhs. J, M, O), and the affidavit of Carla DiCanio Clarke (Item 34, Att. 4).

In October 2002, plaintiff filed a charge with the New York State Division of Human Rights ("NYSDHR"). She complained that her Team Leader/Supervisor, Fred Marschner, issued her an unwarranted counseling letter and harassed her by commenting on her HIV status and assigning her more work than other employees (Item 34, Appendix, Exh. K). A conciliation agreement was reached whereby plaintiff withdrew her charge and ECMC agreed to abide by all anti-discriminations laws, to adhere to its Harassment Policy and the collective bargaining agreement, and not to retaliate against the plaintiff (Item 34, Appendix, Exh. L).

Plaintiff acknowledged that many other employees in the Immunodeficiency Clinic complained about Ms. Walsh's inappropriate behavior as a supervisor (Lewis Dep., p. 43, 44-45, 51). Plaintiff complained that she was reprimanded by Ms. Walsh, forced to attend meetings during her lunch break, given additional work tasks as punishment, criticized in the presence of co-workers, and given negative performance reviews (Lewis Dep., pp. 59, 87). However, plaintiff stated that she was never denied a right at work because she "always reached out for the protection that I supposedly had." *Id.,* p. 97.

Plaintiff asked that she be allowed to change her work schedule for medical appointments and to complete an internship (Lewis Dep., pp. 81-83). Ms. Walsh denied a request for leave for a medical appointment, but plaintiff complained to her union and the leave was granted. *Id.,* p. 90. Plaintiff stated that she was never denied the right to attend a medical appointment. *Id.,* p. 97. On another occasion, plaintiff presented a note from her medical provider, a physician's assistant ("PA") from a practice in Rochester, New York, which Ms. Walsh would not accept. Plaintiff complained to her union and to the Human Resources Department and the situation was rectified. *Id.,* pp. 90-92. After

4

plaintiff gave Ms. Walsh the note from the Rochester medical office, Ms. Walsh closed plaintiff's medical file at ECMC (Lewis Dep., p. 100). Plaintiff admitted that she closed the files of other patients when they left ECMC and acknowledged that it was not burdensome to reopen a file if the patient returned. *Id.* Plaintiff stated that she never asked that her file be reopened and continued to receive care in other departments at ECMC. *Id.,* pp. 101-02. With regard to plaintiff's internship, e-mail correspondence between plaintiff and Katrina Karas Buchholtz, Director of Ambulatory Services at ECMC, indicate that plaintiff's internship supervisor adjusted his schedule so as to accommodate plaintiff's work schedule (Item 34, Appendix, Exh. W).

Plaintiff complained that Ms. Walsh referred to her as a "voodoo worker" in the presence of a large group of people at a luncheon meeting (Lewis Dep., pp. 66-67). She also complained that Ms. Walsh suggested that she take a disability leave at times when plaintiff had taken time off for medical reasons. *Id.,* p. 106.

Plaintiff stated that there were times that she took off of work without pay, but the amount of lost wages she is seeking is "insignificant" (Lewis Dep., p. 114). She is also seeking compensation for lost lunch hours when she was compelled to attend weekly luncheon meetings prior to grieving the issue in approximately 2006. *Id.,* pp. 115-16. Plaintiff complained that, on one occasion, Ms. Walsh "chased" her down the hall to reprimand her. She was fearful and nervous about working with Ms. Walsh and was frightened that Ms. Walsh would harm someone in the department. *Id.,* pp. 118 - 120.

In June 2007, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (Item 34, Appendix, Exh. S). She listed the following examples of harassment by her supervisor: denial of requests for accommodations, "at

least one negative religious based comment and racial slur," improper review and comment on personal medical records, and written discipline for legitimate absences. *Id.* The EEOC was unable to conclude that plaintiff had established a violation of federal law and issued a "right to sue" letter (Item 34, Appendix, Exh. AA).

Kathleen Walsh testified that she mentioned voodoo during a conversation at a luncheon meeting in the context of AIDS treatments in third world countries and island cultures, but denied that she made any comment to plaintiff (Item 34, Appendix, Exh. V, "Walsh Dep.," p. 36). Walsh also denied that she "chased" plaintiff through the clinic as plaintiff had reported. *Id.,* p. 42. Ms. Walsh explained that on Friday afternoons, the clinic conducted staff meetings with speakers and educational updates during the lunch hour. At some point, plaintiff complained to her union about giving up her lunch hour. A compromise was reached whereby plaintiff was allowed to go to lunch from 11:00 a.m. until noon so that she could attend the meeting. It became a long-standing practice for plaintiff to take her lunch at 11:00 a.m. on Fridays. *Id.,* pp. 43-44.

Plaintiff's performance evaluations reflect her clinical competency but show a history of interpersonal problems with her co-workers and supervisors. In 2001, her supervisor Linda Macaluso stated that plaintiff "has difficulty with personalizing and expressing anger" (Item 34, Appendix, Exh D). In 2003, her supervisor Fred Marschner noted that plaintiff did not meet the standards for maintaining positive interpersonal relations and stated that plaintiff "continues to need to work towards becoming a team player." *Id.,* Exh. E. In 2004, Ms. Walsh stated that plaintiff "continues to have difficulty working with other team members which has resulted in tension, divisiveness, and unproductive teamwork." *Id.,*

Exh. F.  In 2007, Ms. Walsh noted the "long standing issue" of plaintiff's difficulty in getting along with others.  *Id.,* Exh. H.  Plaintiff testified that her supervisors generally acknowledged her good performance as a social worker, but she didn't "agree with unlicensed people diagnosing my personality" (Lewis Dep., p. 63).

Carla DiCanio Clarke, an employment law specialist in the Human Resources Department of ECMC, submitted an affidavit in which she set forth the history of plaintiff's internal complaints of discrimination and ECMC's investigation of those complaints (Item 34, Att. 4, "Clarke Aff.")  In early 2007, Ms. Clarke conducted interviews of the plaintiff and Ms. Walsh, as well as 15 other current and former employees of the Immunodeficiency Clinic, and reviewed the results of two earlier investigations of internal complaints filed by plaintiff in 2002 and 2006.  Ms. Clarke concluded that there had been no violation of the ECMC Harassment Policy and that the disputes between plaintiff and Ms. Walsh were the result of a personality conflict (Clarke Aff., ¶ 8).  Ms. Clarke also concluded that Ms. Walsh was a "poor manager, with poor interpersonal communication skills."  *Id.,* ¶ 11.  As Ms. Walsh's position was protected by the collective bargaining agreement and Civil Service Law, Ms. Clarke determined that the only action that could be taken was to counsel Ms. Walsh in an effort to improve her interpersonal communication skills.  *Id.,* ¶12.

In late 2007, Ms. Clarke received another internal complaint from plaintiff.  This complaint included, among other things, the dispute from June 2007 in which Ms. Walsh inappropriately demanded additional documentation from plaintiff for a medical appointment (Clarke Aff., ¶ 15).  Plaintiff acknowledged that she had taken her complaint to the Human Resources Department, which intervened, granted the request for time off, and informed Ms. Walsh that no further documentation was necessary.  *Id.,* ¶ 16.  During

this investigation, both plaintiff and Ms. Walsh expressed a willingness to work together in a more professional manner and participated in two mediation sessions in October and November 2007. *Id.*, ¶¶ 17-19.

At the end of the first quarter of 2008, Ms. Walsh reported to Ms. Clarke that she was concerned about plaintiff's possible misuse of leave time under the Family and Medical Leave Act ("FMLA") (Clarke Aff., ¶ 22). Ms. Clarke examined plaintiff's leave records and confirmed that plaintiff had used FMLA time in conjunction with other paid time off, in violation of ECMC policy. *Id.,* ¶ 23. Plaintiff was issued an oral warning and was advised to provide a doctor's note for her subsequent use of FMLA time. *Id.* Confirmation of the oral warning was placed in plaintiff's personnel file for three years. *Id.,* ¶ 25.

In April 2008, plaintiff wrote to Ms. Clarke complaining that Ms. Walsh had closed her medical file at ECMC (Clarke Aff., ¶ 26). It was determined that plaintiff had submitted a medical certification in January 2007 that she was receiving treatment in Rochester, New York and thus Ms. Clarke found that the closing of the file was consistent with ECMC policy. *Id.,* ¶ 28.

In May 2009, plaintiff sent Ms. Clarke an e-mail describing a confrontation between plaintiff and Ms. Walsh (Clarke Aff., ¶ 30). Ms. Clarke confirmed with several witnesses that Ms. Walsh had behaved in a highly inappropriate manner in a public area of the hospital in the presence of patients, but found no evidence that the confrontation involved either plaintiff's race or her HIV status. *Id.,* ¶¶ 32-33. Thereafter, ECMC retained Ms. Walsh in her job title, but removed her supervisory functions based on her "generally abusive management style with all employees...." *Id.,* ¶ 35.

In June 2009, Ms. Clarke received a complaint that plaintiff had verbally abused a co-worker (Clarke Aff., ¶ 36). While plaintiff denied the allegation, several other employees stated that plaintiff continued to complain about Ms. Walsh and harassed those who disagreed with her. *Id.,* ¶ 37. Plaintiff was issued a written warning that was to stay in her personnel file for three years. *Id.,* ¶¶ 38-39. After plaintiff grieved the warning, it was agreed that the warning would be removed after six months. *Id.,* ¶ 40.

Matthew Higgins, a medical social worker and plaintiff's co-worker, testified regarding the negative aspects of Ms. Walsh's management style (Item 34, Appendix, Exh. R, "Higgins Dep."). He stated that Ms. Walsh was "inconsistent with rules and regulations," treated people differently "based on how she felt about them," and created a hostile work environment. *Id.,* pp. 14-15. Mr. Higgins acknowledged that Ms. Walsh treated some employees better than others, including himself, but was unable to say that Ms. Walsh treated people poorly based on race. He stated "there were other people that she treated poorly who were Caucasian and other races as well." *Id.,* pp. 16-17.

Mr. Higgins stated that Ms. Walsh was referring to plaintiff when she made the remark about plaintiff looking like a "voodoo" worker. He found the remark "bizarre and inappropriate" (Higgins Dep., p. 27). Mr. Higgins also recounted how Ms. Walsh abusively berated plaintiff for putting some medical records into the wrong bin, but then calmed down after Mr. Higgins told Ms. Walsh that he too had placed records in the wrong bin. *Id.,* p. 29. Mr. Higgins witnessed Ms. Walsh accuse plaintiff of breaking the copier machine so as to avoid copying medical charts. *Id.,* p. 31. In a meeting with plaintiff and Shelly Goodman, another African-American employee, Ms. Walsh told Mr. Higgins that he was

the only person working at a high level, that he was being taken advantage of by plaintiff and Ms. Goodman, and that he should resent them. Mr. Higgins thought the statement was untrue and inappropriate, and complained about Ms. Walsh's statement to her supervisor. *Id.,* pp. 55-56. Mr. Higgins also was present when Ms. Walsh followed plaintiff through the clinic and engaged in a heated verbal altercation in the presence of patients. *Id.,* pp. 32-33. Mr. Higgins found the situation "unacceptable" and filed a formal complaint. *Id.*

## DISCUSSION

### 1. Summary Judgment Standard

Summary judgment is warranted when the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citing *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, "courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (citations omitted). However, " 'a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Rather, the non-moving party must " 'offer some hard evidence showing that its version of the events is not wholly fanciful.' " *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

## 2. Disparate Treatment Claims

Plaintiff has alleged claims for disparate treatment based on her race and disability in violation of Title VII, the ADA, and the NYSHRL. Title VII of the Civil Rights Act of 1964 provides that it is unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Similarly, Title I of the ADA prohibits discrimination on the basis of disability with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The NYSHRL prohibits employment discrimination on the basis of, *inter alia*, race or disability. N.Y.Exec. Law § 296(1)(a) (McKinney 2010).

Discrimination claims under Title VII, the ADA, and the NYSHRL are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). It is the plaintiff's burden to establish a *prima facie* case of discrimination, and, if plaintiff does, a rebuttable presumption of discrimination arises and the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). If the defendant articulates a non-discriminatory reason, the presumption of discrimination drops out and the burden shifts back to the plaintiff to show that defendant's reason is actually pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993).

To make out a *prima facie* case of race discrimination under Title VII, plaintiff must allege the following four elements: (1) she falls within a protected class, (2) she was performing her duties satisfactorily, (3) she was subject to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *Gladwin v. Pozzi,* 403 Fed. Appx. 603, 605 (2d Cir. 2010). To establish a prima facie case under the ADA, plaintiff must show by a preponderance of the evidence that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir. 2006).[2]

---

[2] The same elements must be shown to establish a discrimination claim based on disability or race under the NYSHRL. *See Kinneary v. City of New York,* 601 F.3d 151, 158 (2d Cir. 2010); *Pabon v.*

In this case, it is undisputed that plaintiff is a member of a protected class and was performing her duties in a satisfactory manner. However, plaintiff has not shown that she suffered an adverse employment action for purposes of her disparate treatment claim. A plaintiff suffers an adverse employment action when "he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)). A materially adverse change is a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)) (internal quotation marks omitted). "Examples of materially adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities ....' " *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Galabya,* 202 F.3d at 640).

Here, plaintiff is still employed at ECMC. She was never terminated, demoted, or denied a promotion. She admits that any loss of benefits and/or salary is insignificant (Lewis Dep., p. 114). For example, plaintiff cited the lunch hours she spent at Friday staff meetings before she arranged to take her lunch prior to the Friday meetings, or days that she took off when she had no available sick time or FMLA time. The court finds that this undocumented and admittedly *de minimis* loss of salary and/or benefits is not "material" for purposes of plaintiff's discrimination claim. Additionally, plaintiff stated that she was

---

*New York City Transit Auth.,* 703 F.Supp.2d 188, 198 (E.D.N.Y. 2010).

never denied a right under the collective bargaining agreement because she "always reached out for the protection that I supposedly had." *Id.,* p. 97. To the extent that plaintiff complains that she was given negative performance reviews, the court notes that she was found to possess good clinical skills but poor interpersonal skills. "To constitute an adverse employment action, negative evaluations must affect an ultimate employment decision, including decisions concerning promotion, wages or termination." *Hicks v. Baines,* 593 F.3d at 170 (internal quotation marks and citation omitted). Plaintiff's performance evaluations have not been shown to have affected any important employment decisions. Likewise, the disciplinary warnings plaintiff received, related to her possible abuse of FMLA time and inappropriate verbal harassment of a co-worker, did not result in any negative employment action. The court finds that plaintiff has failed to establish a *prima facie* case of disparate treatment in that she has not shown that she suffered a materially adverse change in the terms and conditions of her employment. Accordingly, plaintiff's disparate treatment claims under Title VII, the ADA, and the NYSHRL are dismissed.

### 3. Hostile Work Environment

Plaintiff has alleged that she was subjected to a hostile work environment based on both her race and her disability in violation of Title VII, the ADA, and the NYSHRL.[3] To

---

[3] The court notes that the Second Circuit has yet to rule on the issue of whether or not the ADA recognizes a hostile work environment claim. *See Farina v. Branford Bd. of Educ.,* 458 Fed. Appx. 13, 17 (2d Cir. 2011) ("Even assuming, *arguendo,* that the ADA provides a basis for a hostile work environment claim (an issue this Court has not yet decided) ...."); *Bonura v. Sears Roebuck & Co.,* 62 Fed. Appx. 399, 400 n. 3 (2d Cir. 2003). For the purposes of this motion, the court will assume that a hostile work environment claim is available under the ADA and that the standards for a Title VII hostile work environment claim apply. *See Murphy v. BeavEx, Inc.,* 544 F.Supp.2d 139, 150 (D.Conn. 2008) (noting that "[c]ourts which recognize hostile work environment claims under the ADA apply the same standard utilized in Title VII cases").

prevail on a hostile work environment claim, plaintiff must demonstrate that she was subjected to harassment on the basis of her race or disability. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Plaintiff must also show that the workplace was permeated with "discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). The sufficiency of a hostile work environment claim is analyzed under both subjective and objective measures. *See Harris v. Forklift Sys., Inc.,* 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."). To analyze the objective aspect of a hostile work environment claim, the court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 23).

In this case, there is no doubt but that Ms. Walsh was, at best, a poor manager or, at worst, an abusive tyrant. Additionally, there is proof that plaintiff was not the only employee of the Immunodeficiency Clinic who clashed with Ms. Walsh. Mr. Higgins testified that Ms. Walsh mistreated employees of all races, not simply the plaintiff or other African-Americans. Mr. Higgins essentially corroborated plaintiff's complaints regarding

Ms. Walsh's inappropriate comments and behavior.  However, while the work environment could be described as "hostile," there is scant evidence in the record to suggest that any hostility directed at plaintiff was based on her race and/or disability.

The court notes two specific incidents that comprise the allegedly hostile work environment.  First, the record indicates that, during a presentation about AIDS treatment in Africa, plaintiff expressed a desire to participate in such a program.  Ms. Wash stated that, if she did so, plaintiff would be regarded as a "voodoo worker."  The court finds the comment strange, but not racist.  Another time, Ms. Walsh told Mr. Higgins, in plaintiff's presence, that he should be resentful of plaintiff and another African-American employee because he was working harder than they were.  Again, this comment is odd and inappropriate and was obviously offensive to the affected employees, but it is not explicitly racist.  Even if the court were to find these two incidents to be evidence of a racially-based hostile work environment, these two isolated incidents are insufficient to establish a *prima facie* case.  The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory.  *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (citing *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992)); *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) ("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe.").

Plaintiff has also complained that Ms. Walsh reprimanded her for being loud, accused her of breaking the copier machine to avoid work, asked for additional documentation for medical appointments, criticized her in the presence of co-workers, gave

16

her additional work tasks as punishment, and generally belittled, chastised, and otherwise mistreated her. While these instances were certainly unpleasant to endure, there is no evidence that this hostility was the result of any racially-based animus on the part of Ms. Walsh.

Plaintiff has also alleged that she was subjected to a hostile work environment based on her disability. Instances of harassment that plaintiff traces to her disability include Ms. Walsh's closing of plaintiff's medical file, the request for additional documentation for medical appointments, and statements by Ms. Walsh questioning plaintiff's need for medical appointments and suggesting that plaintiff take a disability leave. The court finds that the closure of plaintiff's medical file was consistent with ECMC policy after plaintiff transferred her medical care to a practice in Rochester. Moreover, if plaintiff wished to reopen her file, she could have done so. Accordingly, the court does not consider the closing of plaintiff's file as harassment. Additionally, Ms. Walsh's request for additional documentation for medical appointments was overruled by the Human Resources Department at ECMC and Ms. Walsh was advised that such additional documentation was not required. Likewise Ms. Walsh's denial of plaintiff's request for time off for a medical appointment was overruled by the Human Resources Department. If it was Ms. Walsh's intention to harass plaintiff by these isolated actions, she was decidedly unsuccessful.

Even if the court credits plaintiff's allegation that Ms. Walsh suggested that she take a disability leave, such a comment, in isolation, would not be sufficient to constitute a hostile work environment. Plaintiff has not established that Ms. Walsh's comment was frequently repeated. Additionally, the comment cannot be seen as severe, physically

threatening or humiliating, or causing an unreasonable interference with plaintiff's work performance. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d at 102. As stated above, "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d at 318 (citation omitted). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Gorzynski,* 596 F.3d at 102 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). The court finds these incidents of alleged harassment based on disability to be isolated and insignificant. There is no indication in the record that any disability-based harassment was so severe and pervasive as to be actionable under the ADA.

Accordingly, the court finds that plaintiff has failed to establish a *prima facie* case of race- or disability-based hostile work environment. Her claims of a hostile work environment under Title VII, the ADA, and the NYSHRL are therefore dismissed.

### 4. Retaliation

Plaintiff has alleged claims for retaliation based on her race and disability in violation of Title VII, the ADA, and the NYSHRL. The court applies the same framework for analyzing Title VII, ADA, and NYSHRL retaliation claims. *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir. 2000); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999). To establish a prima facie case of retaliation under the ADA, the NYSHRL, and Title VII, an employee must demonstrate that: (1) she

engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against her; and (4) a causal connection exists between the protected activity and the adverse action, i.e., a retaliatory motive played a part in the adverse employment action. *See Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d at 177.

These anti-retaliation provisions cover a broad range of employer conduct, prohibiting any "materially adverse" activity that might "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006); *Thompson v. N. Am. Stainless, LP,* –U.S.–, 131 S.Ct. 863, 868 (2011). This standard has been found to be broader than that applied to a claim of disparate treatment, and may include actions which do "not directly or immediately result in any loss of wages or benefits . . .." *Millea v. Metro-North R.R. Co.,* 658 F.3d 154, 165 (2d Cir. 2011); *see also White,* 548 U.S. at 64 (the antiretaliation provision of Title VII, unlike the substantive provision, "is not limited to discriminatory actions that affect the terms and conditions of employment."). The court recognizes, however, that Title VII does not set forth "a general civility code for the American workplace." *Oncale,* 523 U.S. at 80. Thus, "petty slights, minor annoyances, and simple lack of good manners" are normally insufficient to deter a reasonable employee from complaining about discrimination. *White,* 548 U.S. at 68.

Here, plaintiff engaged in protected activity on a regular basis. She lodged internal complaints against Ms. Walsh and filed two separate administrative charges of discrimination. As stated above, plaintiff alleged that she was chastised and berated, chased down the hall, unjustifiably criticized, given negative performance evaluations,

denied schedule changes, and had her medical file closed. While plaintiff found these actions to be unpleasant, none of these actions by plaintiff's supervisor is sufficient to show a materially adverse employment action, even under the broader antiretaliation provisions of Title VII, the ADA, or the NYSHRL. The conduct of Ms. Walsh was annoying and inappropriate, but would not be so adverse as to prevent a reasonable worker from making or supporting a charge of discrimination.

The only employment actions taken by defendant that are arguably materially adverse for purposes of the antiretaliation provisions of the statutes are the formal warnings plaintiff received in April 2008 related to the use of FMLA time and a warning received in June 2009 related to verbal abuse of a co-worker. Written warnings have been found to be actionable in the retaliation context. A formal reprimand "can reduce an employee's likelihood of receiving future bonuses, raises and promotions, and may lead the employee to believe (correctly or not) that [her] job is in jeopardy." *Millea,*, 658 F.3d at 165; *see also Benjamin v. Metro. Transp. Auth.,* 2012 WL 3188764, *14 (S.D.N.Y. August 02, 2012) (written reprimand that would remain permanently in plaintiff's personnel file with potential use in a disciplinary setting could reasonably deter him from complaining of discrimination); *but see Chang v. Safe Horizons*, 254 Fed. Appx. 838, 839 (2d Cir. 2007) (oral and written warnings do not constitute "materially adverse" actions in the view of a "reasonable employee") .

Assuming, for purposes of the motion, that the formal warnings constitute materially adverse employment actions, plaintiff must also "establish the causal connection between the protected activity and an adverse employment action either directly, by offering evidence of retaliatory animus, or indirectly, by demonstrating that the protected activity

was followed in close proximity by the adverse treatment." *Risco v. McHugh*, -- F.Supp.2d --, 2012 WL 2161115, *22 (S.D.N.Y. June 14, 2012) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). At the *prima facie* stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity. However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.' " *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), many courts in this circuit have held that periods of two months or more defeat an inference of causation. *See Yarde v. Good Samaritan Hosp.*, 360 F.Supp.2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected ... activity and the alleged act of retaliation.").

Here, plaintiff received the warning regarding use of FMLA time on April 16, 2008 (Item 34, Appendix, Exh. Z). She filed her EEOC charge in June 2007 and sent an internal complaint to Ms. Clarke dated October 1, 2007 (Item 34, Appendix, Exh. P). The passage of approximately six months between the protected activity and the alleged retaliatory

conduct is insufficiently proximate to support an inference of causation.

Thereafter, in May 2009, plaintiff complained again regarding Ms. Walsh's behavior and specifically noted the incident in which Ms. Walsh "chased" plaintiff into the public area of the clinic and berated her in the presence of other staff and patients. This incident led directly to the removal of Ms. Walsh's supervisory functions (Clarke Aff., ¶¶ 30-35). On June 4, 2009, plaintiff received a warning regarding her job performance. Plaintiff was advised "not to cause disruption in [the] clinic and . . . to treat others with respect" (Item 34, Appendix, Exh. CC). This warning, coming approximately one month after plaintiff's final complaint regarding Ms. Walsh, is sufficiently proximate to satisfy the inference of causation and the *prima facie* case of retaliation.

In response to the *prima facie* case, defendant has offered a legitimate, non-retaliatory reason for the warning. In her affidavit, Ms. Clarke stated that she received a complaint that plaintiff had verbally harassed a co-worker and this harassment was confirmed by another co-worker (Clarke Aff., ¶ 36).[4] While plaintiff denied that the incident occurred, several employees reported that, although Ms. Walsh had been relieved of her supervisory duties, plaintiff continued to complain about her and verbally harassed employees who disagreed with her opinion of Ms. Walsh. *Id.,* ¶ 37. On June 4, 2009, plaintiff was issued a written warning advising her not to engage in disruptive conduct (Item 34, Appendix, Exh. CC). After plaintiff filed a grievance, it was agreed that the warning would be removed from plaintiff's file after six months. *Id.,* ¶ 40.

---

[4] In her affidavit, Ms. Clarke stated that she received the complaint in early June 2008. However, it is apparent that this is an error and the complaint was received in June 2009 after Ms. Walsh had been relieved of her supervisory duties.

As the defendant has presented ample evidence of a legitimate, non-retaliatory reason for plaintiff's written warning of June 2009, the burden shifts back to plaintiff to "point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason was pretextual and that retaliation was a ' substantial reason for the adverse employment action.' " *Kaytor v. Elec. Boat Corp.*, 609 F.3d at 553 (citation omitted). Here, plaintiff has failed to produce any evidence that would permit a reasonable factfinder to conclude that the defendant's proffered reasons are pretextual. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). Accordingly, plaintiff's retaliation claims under Title VII, the ADA, and the NYSHRL are dismissed.

### 5. Failure to Provide Reasonable Accommodations

Plaintiff has alleged that the defendant failed to provide her with reasonable accommodations in violation of the ADA and the NYSHRL. Specifically, plaintiff complains that she was denied a schedule change to complete an internship and a schedule change to accommodate a medical appointment. Under the ADA, it is unlawful to refuse to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To state a reasonable accommodation claim under the ADA, a plaintiff must plead (1) that her employer is subject to the ADA; (2) that she is an individual with a disability; (3) that, with or without reasonable accommodation, she could perform the essential functions of the

job— i.e., that she was a "qualified individual" under the Act; and (4) that the employer had notice of the plaintiff's disability and failed to provide such accommodation. *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995). A reasonable accommodation claim under the NYSHRL is subject to the same standards. *See Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n. 1 (2d Cir. 2004),

In this case, plaintiff asked for a change to her schedule to accommodate an internship, but she was ultimately able to complete her internship without a schedule change. Likewise, plaintiff was given the time off she requested in June 2007, the only specific instance she could recall where Ms. Walsh denied her time off for a medical appointment. Additionally, plaintiff testified that she was never denied the right to attend a medical appointment. As plaintiff was accommodated in both these instances, her claims for the failure to provide reasonable accommodations under the ADA and NYSHRL are dismissed.

## 6. Impermissible Medical Inquiry

Finally, plaintiff has alleged that defendant conducted an impermissible medical inquiry in violation of the ADA and the NYSHRL. The ADA prohibits a covered entity from requiring a medical examination of an employee or making inquiries as to whether an employee is an individual with a disability. 42 U.S.C. § 12112(d)(4). Plaintiff alleges that Ms. Walsh's action in closing her medical file at ECMC violated of this section of the ADA.

The record indicates that plaintiff advised Ms. Walsh that she was receiving care in Rochester, New York. Subsequently, Ms. Walsh closed plaintiff's medical file at ECMC

consistent with clinic policy. There is no evidence that Ms. Walsh improperly "reviewed" plaintiff's medical file. The court finds no impermissible medical inquiry or examination and no proof that defendant violated this statute. Accordingly, plaintiff's claims of an impermissible medical inquiry under the ADA and the NYSHRL are dismissed.

## CONCLUSION

Based on the foregoing, the defendant's motion for summary judgment is granted, and the complaint is dismissed. The Clerk of the Court is directed to close this case. The parties shall bear their own costs.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:    10/24/2012
p:\pending\2009\09-1027.sep1312